**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically at the time and date indicated, which may be materially different from its entry on the record.**



Russ Kendig
United States Bankruptcy Judge

**Dated: 01:50 PM March 31, 2022**

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| | ) | |
| DONNIE JAMES RITTENHOUSE, JR., | ) | CASE NO. 20-60842 |
| | ) | |
| | ) | ADV. NO. 21-6019 |
| Debtor. | ) | |
| _____ | ) | JUDGE RUSS KENDIG |
| ANNE PIERO SILAGY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **MEMORANDUM OF OPINION** |
| | ) | **(NOT FOR PUBLICATION)** |
| DONNIE JAMES RITTENHOUSE, JR., | ) | |
| | ) | |
| Defendant. | ) | |

Anne Piero Silagy, the chapter 7 trustee ("Trustee"), filed a motion for summary judgment seeking to deny Debtor's discharge under three prongs of 11 U.S.C. § 727. Defendant-

1

debtor ("Debtor") opposed the relief,[1] arguing that questions of fact prevent entry of summary judgment.

The court has jurisdiction of this proceeding under 28 U.S.C. § 1334(b) and the general order of reference entered by the United States District Court on April 4, 2012. This is a statutorily core proceeding under 28 U.S.C. § 157(b)(2)(J). The parties consent to final entries by this court. Pursuant to 11 U.S.C. § 1409, venue in this court is proper. The following constitutes the court's findings of fact and conclusions of law under Bankruptcy Rule 7052.

This opinion is not intended for publication or citation. The availability of this opinion, in electronic or printed form, is not the result of a direct submission by the court.

## BACKGROUND FACTS

Debtor is a veteran businessman, working for many years as a business consultant, with a "core competency" in home improvement marketing. (Compl., Ex. 1, 7:17; 54:2-5, ECF No. 1.) Although he does not hold a formal degree, he has taken business-related college courses. (Compl., Ex. 2, 9:6-14, ECF No. 1.) In May 2020, he started a sole proprietorship, Don's Custom Lawn Care. Prior to this endeavor, he was involved in several other businesses:[2]

1. He has an ownership interest in Core Values Consulting Inc. ("Core Values"), an Ohio C-Corporation consulting business that operated at various times in Virginia, Maryland, and Ohio. It began in approximately 2015 and ceased operations in October or November 2019. (Compl., Ex. 1, 8:14-25, ECF No. 1.) One of Core Values' clients was Pella Corporation. (Id. at 53:7-11.) (Compl., Ex. 1, 12:13-15, ECF No. 1.) Core Values has not been active since the relationship with Letty Place Associates ("Letty Place") ended in late 2019. (Id. at 8:22-25.) All of Debtor's income flowed through Core Values. (Id. at 12:13-15.)

   Debtor provided three contradictory ownership positions with no definitive conclusion. On the petition, he indicated he was the 100% owner but changed it to 65% at the 341. (Id. at 8:3.) He identified his mother, Darlene Bryant, as the other shareholder. (Id. at 8:4-9; Compl., Ex. 2, 21:22-25, ECF No 1). Later, he produced a stock transfer document that indicates his daughter, Megan Rittenhouse, holds an interest. (Reply to Mot. Summ. Judg. Ex. 1 ¶ 11; Ex. 1-A, ECF No. 18.)

2. Letty Place was a deck restoration business in Beltsville, Maryland, which also did business as Deck Wizard and Wheaton Door and Window. Debtor was consultant, became CEO in early 2019, and entered into a $2 million

1 Debtor's response to the motion for summary judgment is incorrectly captioned and docketed as a reply. The court will hereafter refer to it as "Response."
2 Except as identified in the description of each company, this information was obtained from Debtor's Schedule A/B, Main Case ECF No. 1.

stock purchase agreement with John (Jack) Weber for fifty percent (50%) of the shares. (Id. at 38:14-25; 54:10-16.) He officially resigned in late 2019 and surrendered his shares. (Id. at 40:24-25; 65:7-12.) Debtor was sued in Maryland concerning the agreement, resulting in a judgment against him exceeding $1.7 million. (Sch. F, Stmt. of Fin. Affairs, Main Case ECF No. 1.)

3. Debtor held a 60% interest in Deck Magic Inc. ("Deck Magic"), a Delaware C-Corporation with a Pittsburgh address, started by Debtor in 2019. It was related to Letty Place in that when Letty Place sold an extended warranty, Deck Magic was the recipient of the warranty contract and provided services under the contracts. Jonathan Page was the other shareholder. (Compl. Ex. 1, 36:15-20, ECF No. 1.) In his petition, Debtor stated Deck Magic had no assets or bank accounts.

4. Debtor was the 60% owner of Chesapeake Outdoor Living Inc. ("Chesapeake"), a home improvement company selling outdoor buildings, gazebos, and similar items. It was an offshoot of Letty Place to create another product line. (Id. 30:18-31:2.) This Delaware C-Corporation, located in Middletown, Delaware, was incorporated on September 13, 2019 and operated only for the last quarter of 2019. Debtor was responsible for the financial matters of the company and held its records, including payable and receivable ledgers and bank accounts. (Id. at 32:6-33:2.) It was funded from a $35,000 - $40,000 loan from Letty Place. (Id. at 34:1-4.) According to Debtor, it no longer has assets or bank accounts.

On May 13, 2020, Debtor filed an individual chapter 7 bankruptcy case, represented by Kenneth Sheppard, Jr. and James Galehouse. (Vol. Petition, Main Case ECF No. 1; Ntc. of Appear., Main Case ECF No. 5.) His debt is mainly business debt, totaling in excess of $2.4 million. (Vol. Petition, Main Case ECF No. 1.) Anne Piero Silagy was appointed chapter 7 trustee. Edwin Breyfogle substituted as counsel on August 13, 2020. (Ntc. Subst., Main Case ECF No. 21.)

When he filed, he identified few assets, including a dower interest in real estate owned at Lake Mohawk in Malvern, Ohio and non-real property totaling $7,500.87. (Sch. A/B, Main Case ECF No. 1.) He also included interests in the businesses identified above, all valued at $0. (Id.)

In August 2020, after the first 341 meeting, Debtor amended his schedules to include twice as much personal property, including several items integral to a lawn care business, a 15' boat, outboard motor, and more. (Am. Sch., Main Case ECF No. 28.) He also amended the Statement of Financial Affairs to list a 2020 transfer of a motor home for $15,000, used to purchase the lawn care equipment. (Id.) In November 2020, Trustee sought turnover of the items of personal property added in the August 2020 amendment. (Mot. Turnover, Main Case ECF No. 43.) The court granted the motion, and property was sold at public auction for $6,296.00. (Rpt. of Sale, Main Case ECF No. 73.)

The 341 meeting of creditors was held on July 21, 2020. (Compl., Ex. 1, ECF No. 1.) James Galehouse, Debtor, Trustee and John Weber, a judgment creditor, appeared. (Id.) Debtor repeatedly testified that he was not a good record-keeper. He was not a good historian regarding Core Values' financial matters. Generally, he was not able to identify the records that were kept, the current accountant, or many other routine details about businesses in which he held the majority shares and which provided his income. He also provided contradictory testimony about who was responsible and maintained records. (Compl., Ex. 1, 27:12-15; Ex. 2, 22:13-23:1.)

After the 341 meeting, on July 22, 2020, Trustee sent an email to Debtor's attorney, James Galehouse, requesting numerous documents. (Mot. Summ. Judg. Ex. 1-A, ECF No. 10.) At the continued 341 meeting, held on September 14, 2020, Debtor produced some documents, mainly bank account records. (Compl, Ex. 3 10:22-23.) The taxes had not been filed. (Id. at 4:18-21.) The meeting was continued because of technical issues. Trustee then convened a 2004 exam on February 19, 2021, nearly nine months after filing and seven months after her initial document request. Debtor testified that the tax returns were filed and counsel produced copies of unsigned returns. On January 22, 2022, eleven months after the 2004 exam and after Trustee filed her motion for summary judgment, Debtor transmitted documents to Trustee and provided an itemized list of what was provided. (Resp. to Mot. Summ. Judg., Aff. and Ex. A, ECF No. 14.) It is unclear which documents were sent for the first time and which were previously provided. Trustee saw some of the documents for the first time, specifically the accountant's verification and a stock transfer ledger. (Reply, Ex. 1 ¶¶ 9, 11.) The document transmission did not satisfy all of her requests. (Id. at 8-9.)

## DISCUSSION

### I.     Summary judgment

To obtain summary judgment, the movant must demonstrate the absence of genuine issues of material fact warranting judgment as a matter of law. Fed. R. Bankr. Pro. 7056; Fed. R. Civ. Pro. 56. "A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 417 U.S. 317, 323 (1986). When considering facts, the court must view all evidence and inferences in favor of the non-movant. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A fact is material when it will affect the outcome of the matter. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Denial of a discharge under § 727 requires proof by a preponderance of the evidence. Barclay's/Am. Bus. Credit, Inc. v. Adams (In re Adams), 31 F.3d 389, 394 (6th Cir. 1994). Once the movant satisfies the initial burden, the non-movant must demonstrate the existence of factual questions warranting trial. Id. at 250.

### II.    Section 727(a)(3)

Trustee argues that Debtor is not entitled to a discharge because he failed to provide

4

copies of personal and business tax returns and other financial information, leaving her unable to understand his financial affairs. The bankruptcy code prevents discharge for a debtor who

> has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all the circumstances of the case.

11 U.S.C. § 727(a)(3). Since a denial of discharge is an extreme remedy that blocks the goal of bankruptcy, a fresh start, exceptions to discharge are narrowly construed to favor the debtor. Sheehan & Assocs. PLC v. Lowe, 2012 WL 3079251, at *3 (E.D.Mich.2012) (citation omitted). However, discharge is a privilege, not a right, and is not intended for the dishonest. CM Temp. Serv., Inc. v. Bailey (In re Bailey), 375 B.R. 410, 415 (Bankr. S.D. Ohio 2007) (citing In re Juzwiak, 89 F.3d 424, 427 (7th Cir.1996) (citations omitted)).

To succeed on her § 727(a)(3) action, Trustee must show Debtor failed to keep or provide adequate records from which she can ascertain his financial condition. Gaft v. Sheidler (In re Sheidler), 2016 WL 1179268, *11 (B.A.P. 6th Cir. 2016) (citation omitted). Trustee argues that Debtor failed to supply her with documents, including basic items like signed tax returns, to allow her to understand his financial picture.

### A. Core Values records

It is nearly impossible to discern what records may exist and who has them from Debtor's frequently contradictory testimony. At the first 341 meeting, he indicated that Darlene Bryant, whom he identified as another business consultant, kept the records for Core Values. (Compl., Ex. 1, 9:17-20, ECF No. 1.) He testified that he was initially responsible for the records but he was "no good at it" and then Ms. Bryant became responsible around 2017. (Id. at 22:24–23:11.) When specifically asked about journals for the business, he both denied keeping such records while at the same time indicating the records were not well kept. (Id. at 23:12-24:6.) He acknowledged bank accounts were maintained, and possibly also at least a partial accounts payable ledger. (Id. at 23:23-24:6.) He stated that records for Core Values were held by both he and Ms. Bryant. (Id. at 27:12-15.) He also testified that he believed there was a QuickBooks file "somewhere" for Core Values. (Id. at 44:13-14.) His testimony changed at the 2004 exam. Trustee learned Darlene Bryant was his mother. (Compl., Ex. 2, 21:22-25, ECF No. 1.) Debtor revealed "I think there was an intent originally that [Darlene Bryant] was going to do bookkeeping for me, but it never materialized. She wound up not doing it." (Id. at 22:13-15.) He then admitted he was solely responsible for the records. (Id. at 22:20-23:1.)

As of the first 341 meeting, Debtor had an extension to file his personal tax return and had not filed taxes for his businesses but anticipated the returns could be filed in sixty (60) days. (Compl., Ex. 1, 46:1-18, ECF No. 1.) By the 2004 exam, he provided copies of unsigned tax returns and averred they had been filed and he could produce a letter from the accountant verifying it. (Compl., Ex. 2, 83:9-84:20, ECF No. 1.) Debtor had not provided the verification

when Trustee filed the summary judgment motion. (Mot. Summ. Judg., Ex. 1, ¶ 10, ECF No. 10.) Trustee declares that she first received it on January 14, 2022 as an exhibit attached to Debtor's summary judgment response. (Reply, Ex. 1, ECF No. 18.)

His inability to recall information is nearly inconceivable. He was unable to name the accounting firm that was handling preparation of the taxes. (Compl., Ex. 1, 27:22-28:3, ECF No. 1.) He could not name the firm that previously handled tax and payroll for Core Values but said he could find and provide the name, as well as some records. (Id. at 28:9-16.) Debtor believed that Core Values maintained various insurance policies, possibly including general liability, workers compensation, and auto. (Id. at 28:17-29:4.) However, at the September 14, 2020 meeting, he could not locate any insurance information. (Compl., Ex. 3, 16:9-17:10, ECF No 1.) In spite of this lack of knowledge, Debtor knew that corporate liability insurance was more complicated to obtain than a personal insurance policy. (Resp. Mot. Summ. Judg., Aff. ¶ G, ECF No. 14.) He did not maintain financial statements for the business. (Compl., Ex. 1, 28:4-6, ECF No. 1.)

Debtor originally testified that no family members were paid from his businesses. (Compl., Ex. 1, 30:8-17, ECF No. 1.) At the 2004 exam, however, he revealed that his wife did database work for Core Values and some of his other businesses as a subcontractor, receiving as much as $22,000 a year. (Compl., Ex. 2, 63:11-64:17, ECF No. 1.) He declared that he could provide invoices and 1099s for her work. He did not. (Mot. Summ. Judg., Aff. ¶ 11, ECF No. 10.)

As detailed above, Debtor repeatedly suggested certain records existed yet never produced them. Attached to his response to Trustee's motion for summary judgment is a summary of documents that he provided to Trustee on January 22, 2022. (Resp. to Mot. Summ. Judg., The sum of records provided for Core Values includes bank statements from January 1, 2017, to November 29, 2019, tax returns for 2017 to 2019, and a stock book. (Resp. to Mot. Summ. Judg., Ex. A.) There are no QuickBooks files, no insurance policies, or declarations, no general, receipt or payable ledgers, all items he believed existed. Trustee provided an affidavit swearing she has not received documents Debtor referenced in this testimony, including "a 'partial' accounts payable ledger, corporate minutes, and invoices substantiating payments that his wife received from Core Values." (Mot. Summ. Judg., Aff., ECF No. 10.)

**B. Chesapeake records**

Regarding Chesapeake, he clearly testified that he was responsible for maintaining records and had those records. (Id. at 32:6-10.)

> Q:     Did you maintain ledgers, any kind of accounts receivable, payable?
> A:     We have a – there's a payable ledger and a receivable ledger and the bank statements.

(Id. at 32:24-33:2.) The only records he provided were a corporation book and a stock book.

6

(Resp. Mot. Summ. Judg., Ex. A, ECF No. 14.) He did not provide a payable or receivable ledger. (Id. at ¶ 5.) There is no paper trail of the money loaned by Letty Place or any documentation of how or where that money was spent. (Id.) The court also notes a curiosity: Debtor's list of documents that he provided does not include tax returns for Chesapeake, nor does the accountant's verification reference preparation of tax returns for Chesapeake. (Resp. to Mot. Summ. Judg., Ex. A and B, ECF No. 14.)

### C.  Deck Magic records[3]

As previously stated, Debtor was a 60% owner of Deck Magic, a company that took responsibility for warranty contracts sold by Letty Place. Debtor believed that Deck Magic had $60,000 - $70,000 in contracts during its operations. It hired three subcontractors, whose names he could not recall but agreed to provide. He did not fulfill that request. (Id.) Although operations management was left to the co-owner, Debtor was responsible for Deck Magic's tax return.

### D.  Letty Place

Debtor worked for Letty Place from February 2019 to November 2019. (Id. at 39:3-5.) He earned roughly $3,000 per week. (Id. at 57:5-10.) When he left, the corporate records stayed with Letty Place. (Id. at 41:3-7.) The CFO was mainly responsible for Letty Place's financials. (Id. at 42:13-15.) When Debtor resigned, he gave up authority to act on behalf of the corporation. (Id. at 46:22-47:6.) He swears that he lost all access to Letty Place records when he resigned. (Resp. to Mot. Summ. Judg., Aff. ¶ K, ECF No. 14.)

### E.  Other

At the conclusion of the 2004 examination, Debtor was specifically asked to provide the following:

-   A verification letter from his accountant that the taxes were filed.
-   Any records regarding the sale of the RV, if such existed, or a confirmation of their non-existence.
-   Contact information for Heartland Payroll, the payroll company used by Letty Place.
-   Copies of invoices or 1099s for Maureen Rittenhouse, Debtor's wife, for work done for any of the businesses in which he was involved.

(Compl., Ex. 2, 83:16-84:12, ECF No. 1.) Only the first record was produced, after Trustee filed the summary judgment motion. (Reply, Ex. 1, ECF No. 18.)

### F.  Trustee demonstrated a lack of records.

The court is convinced that Debtor failed to produce adequate records to allow Trustee to

---

3  Except as otherwise identified, the information contained in this paragraph is taken from the 341 deposition transcript. (Compl., Ex. 1, 34:16-37:23, ECF No. 1.)

7

gain an understanding of his financial history. His records suffer in both quantity and quality.

Prior to Trustee's motion for summary judgment, Debtor provided only unsigned tax returns, which are not valid returns. Olpin v. Comm'r of Internal Revenue, 270 F.3d 1297, 1302 (10th Cir. 2001). Additionally, without supporting documentation, it can be difficult to assess the accuracy of the tax returns. State Bank of India, NY Branch v. Sethi (In re Sethi), 250 B.R. 831, 840 (Bankr. E.D.N.Y. 2000). Tax returns do not provide a comprehensive picture of a debtor's financial condition, including assets. Jacobowitz v. The Cadle Co. (In re Jacobowitz), 309 B.R. 429, 437 (Bankr. S.D.N.Y. 2004) (stating "tax returns reflect only the debtor's reported annual revenues and business expenses, not his assets or net worth.")

To illustrate this issue, consider Debtor's transfer of an RV in February 2020. The transfer was not disclosed on his original Statement of Financial Affairs but Trustee inquired about it during the 341 meeting. (Compl., Ex. 3, 68:12-25, ECF No. 1.) Debtor purchased an RV with Core Values money and titled it to his wife. (Compl., Ex. 2, 15:13-16; 18: 23-25, ECF No. 1-2.) He sold the RV for $15,000 approximately three months prior to filing and used the money to purchase lawn care equipment. (Am. Stmt. of Fin. Aff., Main Case ECF No. 28.) It is unlikely that a tax return would have divulged this transfer or asset.

Similarly, bank records are problematic because they "do not disclose the source of the funds deposited and additionally because there is no substantiation of expenses." In re Juzwiak, 89 F.3d 424, 428. This is adroitly shown when Debtor could not explain transfers into his personal bank account. (Compl., Ex. 2, 73:4-77:8, ECF No. 1.) If Debtor cannot recall or trace the flow of funds into his own account, Trustee's task is more formidable. Without records to substantiate his earnings or the source of the funds, Trustee cannot verify the accuracy of information or gain an understanding of his financial condition.

His failure to maintain or produce typical corporate documents hinders Trustee's ability to comprehend his business transactions. As a specific example, the voluntary petition stated that Deck Magic had no assets or bank accounts. Debtor's 2004 deposition testimony proves this claim to be false. (Compl. Ex. 2, 66:8-71:25, ECF No. 1.) Deck Magic purchased a 2009 Ford F-150 and paid for tags and insurance. (Id.) It is currently sitting in Debtor's driveway with a blown engine and broken windshield. (Id.) According to Debtor, the insurance on it just lapsed. (Id.) Without records like insurance statements or declarations, asset lists, or depreciation schedules, it is nearly impossible to determine what assets may belong to any of Debtor's business entities. With each examination, more questions were raised than answered.

Debtor's records are also spotty. For example, he provided the following for Deck Magic:[4]

| | | |
|---|---|---|
| Expenses | October 2019 | Visa 5864 |
| Deck Magic | June 2019 | Invoices |
| Credit Card Purchases | September 2019 | Deck Magic Visa 5864 |

---

4  Debtor also provided an unsigned tax return and bank statements for Deck Magic.

8

(Resp. Mot. Summ. Judg., Ex. A, ECF No. 14.) If he had access to the Visa account, it is puzzling that he only provided two months' worth of statements, and one month of invoices, not statements and invoices for the few months Deck Magic was in operation. At one point, Debtor testified that he thought Deck Magic had $60,000 - $70,000 worth of contracts. (Compl., Ex. A, 36:3-6, ECF No. 1.) He failed to provide information related to the contracts and subcontractors. (Reply, Ex. 1, ECF No. 18.)

A trustee or creditor is not required to undertake forensic accounting to understand a debtor's financial affairs. "A debtor's records are not satisfactory if a trustee, creditor or the court would have to undertake a time consuming and detailed analysis of bank statements, canceled checks, receipts, and the like in order to determine the debtor's financial condition." In re Steffensen, 534 B.R. 180, 203 (Bankr. D. Utah 2015) (citing In re Juzwiak, 89 F.3d 424). A debtor is obligated to provide enough information "to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present." Turoczy Bonding Co. v. Strbac (In re Strbac), 235 B.R. 880, 882 (B.A.P. 6th Cir.1999) (internal quotations omitted).

Trustee ably demonstrated that Debtor failed to keep records and failed to provide records that would allow her to determine Debtor's financial condition. The burden now shifts to Debtor to provide a justification for the missing documents. Gaft v. Sheidler (In re Sheidler), 2016 WL 1179268, *11 (B.A.P. 6th Cir. 2016) (citation omitted).

### G. Debtor did not justify the lack of records.

In his response to Trustee's motion, Debtor suggests his first attorney was not sufficiently experienced and/or prepared to represent him. (Resp., Aff. ¶ 2a, ECF No. 14.) Using counsel as justification is spurious. This is a matter about records and disclosure, not the degree of counsel's business bankruptcy experience. Debtor's unsupported finger pointing doesn't explain his failure to keep or provide records.

This attempted justification is also legally unavailing.

> Petitioner voluntarily chose this attorney as his representative
> in the action, and he cannot now avoid the consequences of the
> acts or omissions of this freely selected agent. Any other notion
> would be wholly inconsistent with our system of representative
> litigation, in which each party is deemed bound by the acts of his
> lawyer-agent and is considered to have 'notice of all facts, notice
> of which can be charged upon the attorney.'

Link v. Wabash R.R. Co., 370 U.S. 626, 633-34 (1962) (quoting Smith v. Ayer, 101 U.S. 320, 326 (1879)). Debtor's duties to provide a full and complete disclosure, and be truthful, exist regardless of counsel's confusion or inexperience. In re Stone, 504 B.R. 908 (Bankr. C.D. Ill. 2014). Debtor cannot lay the blame on counsel.

9

He also contends that he provided the documents to counsel and believed that they were sent to the trustee. (Resp., Aff. ¶ 2j, ECF No. 14.) This misses the mark. Debtor makes no argument that the records presented to counsel were sufficient for Trustee to ascertain his financial condition. It does not explain one of Debtor's biggest problems, his failure to provide multiple records referenced during the 341 and 2004 exams. And it does not justify his failure to keep normal business records. "Sophisticated business persons are generally held to a high level of accountability in record keeping." Meridian Bank v. Alten, 958 F.2d 1226, 1231 (3d Cir. 1992). A debtor is not required to submit perfect or complete records but must provide enough information for Trustee to understand a debtor's financial position. In re Strbac, 235 B.R. 880 (citing In re Martin, 141 B.R. 986, 995 (Bankr. N.D. Ill.1992). The facts of each case dictate what records are appropriate, and considerations include the 'debtor's occupation, financial structure, education, experience, sophistication and any other circumstances that should be considered in the interest of justice.' Strbac, 235 B.R. 880, 882 (citing United States v. Trogdon (In re Trogdon), 111 B.R. 655, 658 (Bankr. N.D. Ohio 1990)). Debtor's background warrants a higher standard of record-keeping that Debtor did not meet. He had 'a duty to preserve those records that others in like circumstances would ordinarily keep.' Allied Bus. Brokers, Inc. v. Amro (In re Amro), 326 B.R. 901 (B.A.P. 6th 2005) (quoting Miller v. Pulos (In re Pulos), 168 B.R. 682, 692 (Bankr.D.Minn.1994)). Debtor did not maintain the financial records that his experience and background dictate.

Debtor was a majority shareholder in three corporations and CEO of a fourth in which he was purchasing a 50% interest. Review of his testimony suggests that he was aware of the type of typical corporate records kept for such entities, including general ledgers, accounts receivable ledgers and accounts payable ledgers, financial statements, balance sheets, and more. Yet he did not produce a single one of these records for any of the businesses in which he held an interest.

Debtor's re/submission of all documents to Trustee on January 22, 2022, after she filed the motion for summary judgment, is a belated, inexcusable attempt to cure any deficiencies that existed. Wolinsky v. O'Hara (In re O'Hara), 2011 WL 1467927, *11 (Bankr. N.D.N.Y. 2011) (describing Debtor's provision of boxes of documents and issuance of subpoenas to third parties after motions for summary judgment as "too little, too late."); see also Sun Trust Bank v. Blue Water Fiber, L.P., 210 F.R.D. 196 (E.D. Mich. 2002) (listing several cases denying discovery-related motions filed after discovery, including some near or after summary judgment). Trustee made document requests during the 341 meeting, the continued 341 meeting, and the 2004 exam. Discovery in this proceeding concluded on November 30, 2021, and Trustee filed her motion on December 14, 2021. For Debtor to now submit and/or resubmit documents contravenes his duty to cooperate with Trustee to allow her to perform her duties. 11 U.S.C. § 521(a)(3).

His "resubmission" included at least one document that Trustee had never seen before, the Stock Transfer Ledger. (Reply Mot. Summ. Judg., Ex. 1-A, ECF No. 18.) The resubmission also contained various documents Trustee obtained by subpoena, not documents produced by Debtor. (Id., Aff. ¶ 7.) Debtor produced records he never mentioned and mentioned records he never produced. No reasonable person could identify, with any degree of confidence, what records actually exist.

There is an inescapable perception that Debtor was engaged in parceling records and information on an "as caught" basis. *Ad hoc* disclosure is denounced because of the atmosphere that may develop. "'[I]f this type of conduct were to be condoned and would cure denial of discharge, chaos in the Bankruptcy Courts would result because [debtors] would be encouraged to falsify filings with the concept of a later remedy by disclosure if it subsequently appeared that the false filings would be discovered.' UST v. Kerr (In re Kerr), 2017 WL 3880875, * 18 (Bankr. N.D. Ohio 2017) (quoting Villas on the Green, Inc. v. Trauger (In re Trauger), 101 B.R. 378, 382 (Bankr. S.D. Fla. 1989); see also, Payne v. Wood, 775 F.2d 202, 205 (7th Cir.1985)('The operation of the bankruptcy system depends on honest reporting. If debtors could omit assets at will, with the only penalty that they had to file an amended claim once caught, cheating would be altogether too attractive. The omission of assets may be a good reason to deny or revoke a discharge.')."

To justify the unsigned tax returns, Debtor references his sworn testimony that the tax returns were filed. (Resp. Mot. Summ. Judg., Aff. ¶ 2(i), ECF No. 14.) Even in the light most favorable to Debtor, it does not matter. Without additional supporting documentation, tax returns do not provide a full picture of Debtor's financial condition. Trustee has the right to information to substantiate the information and accuracy of figures in Debtor's tax return.

Finally, the time frame at issue is also striking. Trustee is seeking records for entities that were operating within a year of Debtor's bankruptcy filing. Cf. Barbacci v. Stimer (In re Stimer), 2020 WL 1518536 (Bankr. N.D. Ohio 2020) (declaring debtor was not expected to retain copies of cancelled checks he obtained seven or eight years ago). Two of the four entities did not operate a full year. This is not a case of old records or massive records. It is not a case of an unintentional loss of records. It is a case of a failure to maintain records.

Debtor has not established a justification for his failure to provide records that would normally be kept for the businesses he operated. He has not shown a justification the lack of information to provide Trustee with information to assess his financial affairs.

## CONCLUSION

Debtor has a duty to provide adequate records for Trustee to understand his financial affairs leading to the bankruptcy. If he cannot, he is not entitled to a discharge. 11 U.S.C. § 727(a)(3). Trustee has the burden to show the court that there is a lack of records, which she accomplished. Debtor failed to justify the lack of records.

Viewing the facts in the light most favorable to Debtor, this case involves a capable businessman disregarding his duty to maintain typical business records for multiple corporations. It is a case where that same businessman filed bankruptcy and did not provide enough information for the Trustee to assess his financial condition. For this reason, he is not entitled to a discharge. An order granting Trustee's motion for summary judgment will be entered immediately and Debtor's discharge will be denied under 11 U.S.C. § 727(a)(3).

Because the court finds grounds to deny discharge under § 727(a)(3), consideration of

Trustee's claims under § 727(a)(4) and (5) is not necessary. <u>Gandy v. Schuchardt (In re Gandy)</u>, 645 Fed.Appx. 348, 352 (6th Cir. 2016) (citing <u>Beaubouef v. Beaubouef (In re Beaubouef)</u>, 966 F.2d 174, 177 (5th Cir.1992)).

#     #     #

<u>**Service List:**</u>

John J. Rutter
Roetzel & Andress, LPA
222 S. Main Street
Akron, OH 44308

Edwin H. Breyfogle
108 Third Street NE
Massillon, OH 44646